# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Abelardo Niebla-Torres,<br><br>　　　　　Defendant. | No. CR-14-02037-TUC-RCC (DTF)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court are Defendant's Motion to Preclude Statements (Doc. 45) and the Government's Motion for Admission of Evidence Under Rule 404(b) (Docs. 37, 47, 55). This matter came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 5.1. Evidence was heard on February 19 and 20, 2015.[1] This matter was submitted following oral argument at the conclusion of the hearing.

Defendant alleges his statement was taken without a knowing waiver of his Constitutional rights and was involuntary. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motion to suppress. The Magistrate Judge also recommends that the District Court grant the government's motion to admit evidence under Rule 404(b).

---

[1] "RT" refers to the Reporter's Transcript of the February 19 and 20, 2015 evidentiary hearing. (Docs. 70, 71.)

# I.
# DISCUSSION

## A. *MIRANDA* AND VOLUNTARINESS

For incriminating statements obtained during a custodial interrogation to be admissible, any waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). A waiver of *Miranda* rights "is knowing and intelligent if, under the totality of the circumstances, it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (citations and quotations omitted). There is a presumption against waiver, and the Government bears the burden of proving a valid waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986).

To ensure due process, the test for determining the voluntariness of a suspect's confession is whether, considering all the circumstances, the government obtained the statement by physical or psychological coercion or by inducement so that the suspect's will was overcome. *See United States v. Coutchavlis*, 260 F.3d 1149, 1158 (9th Cir. 2001) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)).

At the motions hearing and in his moving papers, Niebla-Torres relies on *United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014). Tymond Preston was an intellectually disabled eighteen-year-old. The police repeatedly presented Preston with the choice of confessing to a heinous crime or to a less heinous crime. They continually rejected his denials of guilt and instructed him on the responses they would accept. They also fed him the details of the crime to which they wanted him to confess. Niebla-Torres asserts these same tactics were used in his case.

At the motions hearing, the government called Border Patrol Agent (BPA) Manual Alonzo. BPA Alonzo was assigned to the Ajo Border Patrol Station where his duties included interviewing arrestees. (RT 2/19/15 at 10, 41.) On November 27, 2014, BPA Alonzo was in plain clothes and unarmed. (*Id.* at 11, 17.) It was his habit and practice to

identify himself orally and by showing his badge and identification to arrestees. (*Id.* at 11.) He would then ask routine booking questions. (*Id.*) According to BPA Alonzo, he followed this practice with Niebla-Torres. (*Id.* at 12.) He then sat down at a table next to him in the booking room and read to him in Spanish his rights from the standard Immigration Form I-214 (Ex.1). (RT 2/19/15 at 15, 16-17.) This form provides all of the essential rights before a custodial interrogation may lawfully begin. (Ex. 2.) While reading, BPA Alonzo pointed his finger at each Spanish word, so Niebla-Torres could follow along. (RT 2/19/15 at 17.) After he was read his rights, Niebla-Torres told BPA Alonzo that he understood the rights and signed the form acknowledging he understood. (*Id.* at 17-18; Ex. 2.) Niebla-Torres also said he was willing to talk to BPA Alonzo and signed the form so indicating. (RT 2/19/15 at 19; Ex. 2.) BPA Alonzo then advised the codefendant of his rights. (RT 2/19/15 at 46.)

BPA Alonzo did not present Niebla-Torres with any other forms. (*Id.* at 18.) However, Niebla-Torres signed numerous other forms, including Record of Sworn Statement in Affidavit Form I-215B (Ex. 5), Medical Screen Form (Ex. 6), "Aviso De Abandono" (Property Abandonment advise) (Ex. 7), and the Filed Processing Form I-213 (Ex. 8). These forms were presented by other BPAs as indicated by their signatures and star numbers on the forms.[2]

Sometime thereafter, BPA Alonzo brought Niebla-Torres into an interview room equipped with video and audio equipment and recorded his statement. (RT 2/19/15 at 19-20.) This interview began with the agent advising Defendant that it was being recorded and administering an oath. (Exs. 3, 4.) Then the following colloquy occurred.

BPA Alonzo: Did you sign your rights voluntarily?

Niebla-Torres: Well, I signed a while ago but I don't know which one it was.

BPA Alonzo: What I gave you.

Niebla-Torres: Yes.

---

[2] A star number is an identifying number unique to an individual agent at a particular Border Patrol Station. (RT 2/20/15 at 46-47.)

- 3 -

> BPA Alonzo: Did you sign voluntarily, your rights, when I read them to you?
>
> Niebla-Torres: Yes, yes.
>
> BPA Alonzo: Do you want me to read them to you again?
>
> Niebla-Torres: No.
>
> BPA Alonzo: OK, Have you been promised anything?
>
> Niebla-Torres: What?
>
> BPA Alonzo: Have you been promised anything?
>
> Niebla-Torres: No.

(Ex. 4 at 2.) Thereafter, Niebla-Torres answered BPA Alonzo's questions and implicated himself in the charged conspiracy. (Exs. 3, 4.)

Niebla-Torres refuted BPA Alonzo's testimony. Niebla-Torres testified that he was handed all of the papers described above and told to sign them. (RT 2/19/15 at 54-57.) He followed these instructions and signed them. (*Id.*) Niebla-Torres did not remember if BPA Alonzo read him his rights and, at the hearing, he stated that he did not understand those rights. (*Id.* at 58-59.) Niebla-Torres then testified that BPA Alonzo threatened him before turning on the videotape recording. (*Id.* at 60-61.) According to Niebla-Torres, BPA Alonzo told him he would go to prison for seven years and would not see his family if he did not answer the questions the way BPA Alonzo instructed him. (*Id.*) During Niebla-Torres's direct examination, he attributed the majority of his recorded responses to BPA Alonzo's questions to this pre-interview coaching session. (*Id.* at 64-69.)

During cross-examination, Niebla-Torres described meeting an individual named Victor in Mexico who hired him to do some work in the United States. (*Id.* at 75, 91-92, 110-12.) While still in Mexico, Victor told Niebla-Torres that people would cross with suitcases containing about 20 kilograms of marijuana each. (*Id.* at 105-06.) Niebla-Torres said that he had come to the United States with Victor and had been on the mountain for three to four days before he was arrested. (*Id.* at 73-74.) According to Niebla-Torres, he

- 4 -

1  did not know why he was on the mountain, what he was hired to do, how long he was
2  going to stay, or whether he would be paid. (*Id.* at 71, 74-76, 93-94, 96.) He admitted
3  using binoculars, carrying a cellular telephone provided to him by Victor and wearing
4  camouflage clothing, but had no reason or explanation for any of these. (*Id.* at 77, 83-86
5  94-95, 97-98.) When confronted with his videotaped statements, Niebla-Torres continued
6  to point to BPA Alonzo, claiming he was instructed to give those answers before the
7  interview began. (*Id.* at 86-90.)

8        Niebla-Torres's testimony at the evidentiary hearing painted the picture of an
9  individual fearful of the border patrol agent and simply parroting on videotape what he
10 was told to say beforehand. The Court finds Niebla-Torres's testimony incredible. One
11 need not go any further than the videotaped confession to reach the conclusion that
12 Niebla-Torres's testimony before the Court was false. (*See* Ex. 3.) Niebla-Torres's
13 responses on the videotape were clearly spontaneous and unrehearsed. At various points
14 in the recording BPA Alonzo asked a leading question, suggesting the answer, and
15 Niebla-Torres contradicted the agent. At other points he refused to answer questions. In
16 one colloquy, BPA Alonzo reminded Niebla-Torres that he was under oath and was
17 required to be truthful. BPA Alonzo had asked Niebla-Torres to identify the others who
18 were on the mountain with him. Niebla-Torres remained firm; he did not admit to
19 knowing their names or nicknames. (Exs. 3, 4 at 8.) At the motions hearing, Niebla-
20 Torres freely identified one of these individuals as Victor. (RT 2/19/15 at 74.) At another
21 point BPA Alonzo asked, "Do you know it's a crime to transport or aid in the
22 transportation of humans into the United States?" (Ex. 4 at 9.) Niebla-Torres responded,
23 "Yes, but I didn't transport people." (*Id.*) These are hardly the responses of a person who
24 has had their will overborn and is simply parroting responses provided to him by a
25 domineering law enforcement officer, as suggested by Niebla-Torres's testimony.

26       The difference between Niebla-Torres's responses on direct and cross-examination
27 was stark. In one example, on direct examination Niebla-Torres said that he only knew
28 the weight of the suitcases and their content because that is what BPA Alonzo told him to

1  say in the prerecorded session. (RT 2/19/15 at 67, 69.) On cross-examination, Defendant
2  acknowledged that he knew what was in the suitcases and their weight because Victor
3  had told him before he came with him to the United States. (*Id.* at 105-06.) Defendant
4  also stated that he thought Victor was going to be crossing marijuana and reporting on the
5  movements of law enforcement officers, and he had been invited to work with Victor he
6  thinks to smuggle marijuana (*Id.* at 72, 106-07, 108, 110.) However, he stated "the 20
7  kilos, we hadn't crossed it yet." (*Id.* at 107.)

8        The record in this case is vastly different from the record presented to the court in
9  *Preston*. There, psychological evaluations showed Preston had an "exceptionally limited
10 linguistic ability," and "significant problems with verbal communication and
11 comprehension." 751 F.3d at 1010. Critically, the officers were aware early in the
12 interrogation that Preston was intellectually impaired. *Id.* at 1020. The facts in *Preston*
13 clearly established the "officers rejected as false—over and over again—Preston's
14 accurate responses" and "Preston's confession . . . was a brief gathering of details chosen
15 by the officers, and written out in [the FBI agent's] hand. Many of the details selected
16 were those the officers had fed Preston." *Id.* at 1012, 1014. Here, the Court finds no such
17 coercive techniques were used. The testimony of BPA Alonzo, that he conducted one
18 interview, is corroborated by the videotape showing the demeanors of both BPA Alonzo
19 and Niebla-Torres and his responses to the questions. The questions and answers were
20 spontaneous not rehearsed. There is no evidence of repeated rejection of a claim of
21 innocence. Indeed, there is no evidence that Niebla-Torres ever made any claim of
22 innocence, except that he had not smuggled aliens. Although not well educated, there is
23 no evidence or contention that Niebla-Torres was mentally disabled or that there was any
24 reason for BPA Alonzo to be concerned about his basic intellectual abilities.

25       Niebla-Torres's claim that BPA Alonzo had not advised him of his rights before
26 the interview is equally incredible. Niebla-Torres testified that he was given a number of
27 papers and told to sign them. It is clear from these documents (Exs. 1, 5, 6, 7 and 8) that
28 different people presented these forms to Niebla-Torres, consistent with BPA Alonzo's

testimony. The I-214 rights form bears Niebla-Torres's signatures indicating he understood his rights and waived them. The videotape of the interview confirms BPA Alonzo asked Niebla-Torres whether he wanted his rights read to him again and whether he had voluntarily waived these rights.

Accordingly, this Court finds the government has met its burden to establish Defendant was properly advised of his *Miranda* rights and that he knowingly and voluntarily waived these rights. The Court also finds Defendant's recorded videotaped statement was voluntary. Therefore, the Magistrate Judge finds the motion to suppress statements should be denied.

### B.     ADMISSION OF EVIDENCE UNDER RULE 404(B)

The government moves in limine to admit uncharged misconduct as evidence-in-chief to prove Defendant's knowledge, intent, and lack of mistake. The government submitted a proffer of the evidence it seeks to present at trial. This proffer indicates that on September 14, 2011, near Gu-Vo, BPAs Vicente Paco and Rumaldo Nunez, both dressed in civilian clothing, approached an SUV that was stuck just off the roadway. (Doc. 55 at 2, 6, 7.) After the agents identified themselves, the individuals in the SUV fled into the desert. (*Id.* at 3, 7.) Niebla-Torres was one of four individuals that were later apprehended by BPAs. (Docs. 55-2, 55-3.) Inside the abandoned SUV, BPAs found five to six very large backpacks filled with food and extra clothing, sleeping bags, cell phone chargers, binoculars and fuel cell cans to heat food. (Doc. 55-3 at 3, 7.)

After Niebla-Torres was apprehended, BPA Paco advised him of his *Miranda* rights from a card provided to agents by the border patrol (s*ee* Ex. 10). (Doc. 55 at 3.) Defendant was later transported to the Ajo Border Patrol station where he spoke to BPA Paco. (*Id.*) Niebla-Torres stated that he entered the United States to scout for law enforcement officers and report their presence to others who would be importing drugs. (Doc. 55-3 at 3.)

Evidence of crimes, wrongs or other acts may be admitted under Federal Rule of Evidence 404(b)(2) to show "motive, opportunity, intent, preparation, plan, knowledge,

identity, absence of mistake, or lack of accident." It may not be admitted to demonstrate the character of a person and that he acted in conformity with his character. Fed. R. Evid. 404(b)(1). For evidence to be admitted under this rule:

> (1) there must be proof of the prior bad act based on sufficient evidence; (2) the crimes or acts must not be too remote; (3) the prior conduct must be similar to the acts defendant is charged with; and (4) the evidence must prove an essential element of the offense.

*United States v. Houser*, 929 F.2d 1369, 1373 (9th Cir. 1990), *abrogation on other grounds recognized by United States v. Serrano*, 313 F. App'x 10 (9th Cir. 2008) (citing *Buford v. United States*, 532 U.S. 59, 64-66 (2001)).

### 1.     Prior Act Statements

Because the prior bad act evidence included statements of Defendant made during an in-custody interrogation, the Court held a hearing on February 20, to determine their admissibility. BPA Paco testified that he read *Miranda* rights to Niebla-Torres in Spanish[3] from a Border Patrol issued rights card (Ex. 10). (RT 2/20/15 at 28.) After he read him his rights, Niebla-Torres said that he understood them and was willing to speak and did voluntarily make a statement to BPA Paco. (*Id.* at 29.) There was no evidence presented to rebut BPA Paco's testimony, except argument that the event occurred three years earlier and it was not contained in a report. However, BPA Paco referenced many reasons why the event stood out in his memory, as discussed below, and the Court finds him credible. Further, a contemporaneous written report states that Defendant agreed to make a statement without a lawyer present. (Doc. 55-3 at 3.) Accordingly, the Court finds Niebla-Torres's statement to BPA Paco was lawfully obtained.

### 2.     Four Predicates

#### a.     Is there proof of the prior bad act?

Here, the prior act will be established by two eye witnesses. BPAs Paco and Rumaldo arrested Defendant, discovered the scouting tools, and BPA Paco took Niebla-Torres's statement that he was a scout. (Doc. 55.) Defendant asserts the witnesses would

---

[3] BPA Paco was born in Mexico and Spanish is his native language. He considers himself fluent in Spanish and learned English at age 9.

- 8 -

1 not be able to remember the events given the passage of three years and that many of the
2 details were not contained in a written report. Thus, he argues the evidence is insufficient
3 as a matter of law. First, BPA Paco testified at the motions hearing that he could recall
4 the events and pointed to several plausible reasons, including that Niebla-Torres was
5 from the same small village in a remote part of Mexico where his great-grandparents had
6 lived. (RT 2/20/15 at 31.) Additionally, there are contemporaneous written reports that
7 contain the basic information regarding Defendant's 2011 arrest. Second, Rule 404(b)
8 evidence is not subject to heightened scrutiny. The standard for admission is whether a
9 reasonable jury could find the act occurred. Based on the proffered evidence, a jury could
10 reasonably find Niebla-Torres was a scout for a drug organization when arrested on
11 September 14, 2011. *See Huddleston*, 485 U.S. at 689; *United States v. Major*, 676 F.3d
12 803, 809 (9th Cir. 2012).

### b.     Was the crime or act too remote?

There is no bright-line test to determine remoteness. *United States v. Spillone*, 879 F.2d 514, 519 (9th Cir. 1989). Defendant's prior arrest was on September 14, 2011, 38 months prior to the arrest at issue in this case. Defendant does not contend that this is too remote in time and the caselaw supports a finding that it is not. *See Houser*, 929 F.2d at 1373 (finding a conviction from five-years prior was not too remote); *United States v. Howell*, 231 F.3d 615, 629 (9th Cir. 2000) (finding a six-year period not too remote particularly as the prior conviction was for the same offense). When the prior acts are very similar to the charged conduct, remoteness is of a lesser weight. *United States v. Johnson*, 132 F.3d 1279, 1283 (9th Cir. 1997). Given the character of the prior act and the current charges, the court finds the passage of 38 months is not too remote. *See United States v. Vo*, 413 F.3d 1010, 1018 (9th Cir. 2005) (finding14 years not too remote for drug trafficking bad act, which showed familiarity with illegal drug distribution and lack of mistake).

### c.     Was the prior act similar to the charged acts?

The indictment charges Defendant with a conspiracy to possess a controlled

substance with intent to distribute. (Doc. 8.) The government's theory and evidence purports to show that Defendant was engaged in scouting for law enforcement while controlled substances were brought into the United States from Mexico. Defendant was arrested in a remote area in Southern Arizona near the international border. The evidence the government intends to offer includes items of evidence seized from or near Defendant at the time of his arrest. That evidence includes binoculars, radios, cellular telephones, and camouflage clothing. Defendant also confessed.

In the prior act, Defendant was arrested in a remote area in Southern Arizona near the international border and in the general vicinity of the charged offense. The evidence discovered in this event included binoculars, cellular telephone batteries, camouflage clothing and other items typically used by scouts. Again, Defendant confessed. This prior act is sufficiently similar to the charged offense to satisfy this prong.

d. <u>Does the prior act prove a material element of the offense?</u>

The government offers the prior act evidence under the theory that it helps establish the *mens rea* of the charged offense. As noted by the Supreme Court in *Huddleston*, 485 U.S. at 685, other act evidence may be very probative of the actor's state of mind and the only means of ascertaining the mental state is by drawing inferences from conduct. Here, Niebla-Torres denies his involvement in the charged offense. He testified at the motions hearing that at the time of his arrest he had "just arrived" and did not know what was going on. He denied knowledge. He also claimed his confession was coerced. Here, the other act evidence is offered to prove an essential element, Niebla-Torres's criminal intent.

The government also offers the evidence to prove lack of mistake. The other act evidence is probative on this issue as well. Defendant testified at the motions' hearing that he was merely present at the scene when the agents arrested him. In other words, he was just innocently in the wrong place at the wrong time. The other act evidence is very similar to the instant offense. Accordingly, the other act evidence will allow the jury to consider the likelihood of these similar events innocently happening twice. *See Howell*,

231 F.3d at 628 (admitting prior act evidence to rebut defendant's defense of mere presence and innocent motive).

### 3. Admission of Evidence Under Rule 403

Rule 404(b) is a rule of inclusion, not exclusion. *United State v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007) (en banc). Once the requirements of Rule 404(b) have been met, "the relevant Advisory Committee Notes make it clear that the 'only' conditions justifying exclusion of the evidence are those described in Rule 403: unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence." *Id.* at 945; *see also Huddleston v. United States*, 485 U.S. 681, 685 (1988) (extrinsic acts evidence may be critical to issues involving the actor's state of mind and the only means of ascertaining the mental state is by drawing inferences from conduct). Thus, the Court must determine whether the probative value is substantially outweighed by its prejudicial effect, pursuant to Rule 403.

The Court considered four factors to determine the probative value of the uncharged misconduct: the definiteness of proof that Defendant committed the act, how probative the act is of a material fact, whether the material fact is in genuine dispute, and the availability of alternative, less prejudicial evidence to prove the material fact. Edward J. Imwinkelried, *Uncharged Misconduct Evidence* Section 8:3 (2004). The Court has thoroughly reviewed the evidence in this case, including the proffered facts in the parties' pleadings and two days of testimony taken during the motions' hearing. *See Curtin*, 489 F.3d at 957-58 (requiring the court to review in detail all of the proffered other act evidence).

The proof that Defendant committed the uncharged act is strong. The evidence includes eye witness testimony, photographs and Defendant's confession. The government offers the other act evidence to prove Defendant's intent and to demonstrate lack of mistake. Both of these are at issue. Defendant asserts he was merely present at the scene and did not have any knowledge about what was going on. He also has recanted his confession. There is no other undisputed evidence available as an alternative to the other

act. Balancing these interests, the Court concludes the danger of unfair prejudice does not outweigh the probative value of the other act evidence in this case. Therefore, the Magistrate Judge finds the motion to admit Rule 404(b) evidence should be granted.

## II.
## RECOMMENDATION

It is recommended that, after its independent review of the record, the District Court deny Defendant's Motion to Suppress (Doc. 45) and grant the government's Motion for Admission of Evidence Under Rule 404(b) (Doc. 37). Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. A party may respond to the other party's objections within fourteen days. No reply brief shall be filed on objections unless leave is granted by the district court. If objections are not timely filed, they may be deemed waived.

Dated this 23rd day of February, 2015.

D. Thomas Ferraro
United States Magistrate Judge